IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| VANCE HENRY, | ) |
|           Plaintiff, | ) |
|     vs. | ) 25CV10812 |
| The CITY OF CHICAGO, Illinois, a municipal corporation, and Chicago police sergeant JOHN CONNEELY #1262, | ) Judge<br>)<br>) Magistrate Judge |
|           Defendants. | ) |

## COMPLAINT

Plaintiff, VANCE HENRY makes the following complaint against the CITY OF CHICAGO ("Defendant CITY") and Chicago police sergeant JOHN CONNEELY #1262 ("Defendant CONNEELY").

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. §1983 to seek relief and damages for the deprivation under color of law of plaintiffs' rights as secured by the United States Constitution.

2. This Court has jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper for this Court under 28 U.S.C. § 1391(b) because the events in this case occurred in this district.

## THE PARTIES

4. Plaintiff VANCE HENRY is a 60-year-old African American resident of Chicago, Illinois.

5. At all relevant times, Defendant CONNEELY is or was a sworn member of the Chicago Police Department (CPD), employed by Defendant CITY, and acting under the color of law and within the scope of his employment.

6. Defendant CITY is a municipal corporation duly incorporated under the laws of the State of Illinois and it is or was the employer and principal of Defendant CONNEELY. Should Plaintiff

1

prevail on any of his federal claims against Defendant CONNEELY, the CITY will be required to indemnify Defendant OFFICERS under Illinois law, 735 ILCS 10/9-102.

## HENRY'S Career With The City Of Chicago

7. In June of 2023, HENRY retired following a 23-year career with the City of Chicago.

8. From 2000 to 2009 HENRY was an Executive Director of the Office of Community Policing and Implementation at the CPD.

9. In his role as Executive Director, HENRY was a liaison between the community and CPD.

10. From 2009 to 2015 HENRY was Deputy Chief of Staff over Community and Faith-Based Partnerships for the Office of the Mayor of the City of Chicago.

11. From 2015 until his retirement, HENRY was the Chief of Faith Engagement for the Mayor.

12. In both of his roles for the Mayor, HENRY worked as a liaison between community-based and faith-based organizations and the City of Chicago.

## Defendant CONEELY'S Unlawful Stop And Search Of HENRY

13. On September 8, 2023, HENRY was travelling in his car on Pulaski Road near 2500 South State Street in Chicago, Illinois.

14. On September 8, 2023, Defendant CONNEELY was on duty as a Chicago police officer working in the same area.

15. HENRY was driving his car in a lawful manner; he had a valid driver's license and the car was insured.

16. In spite of the fact that HENRY was doing nothing wrong, Defendant CONNEELY signaled for him to pull over.

17. HENRY complied with the signal and pulled over.

18. From the moment Defendant CONNEELY signaled for HENRY to pull over, HENRY was not free to leave.

19. HENRY was seized when he was pulled over within the meaning of the Fourth Amendment.

20. Defendant CONNEELY had neither probable cause nor reasonable suspicion to pull HENRY over.

21. HENRY tried to photograph Defendant CONNEELY and his vehicle.

22. Defendant CONNEELY became angry when HENRY tried to photograph his vehicle.

23. Defendant CONNEELY began yelling at HENRY and approached HENRY's vehicle.

24. Defendant CONNEELY ordered HENRY out of his car.

25. Defendant CONNEELY searched HENRY and placed him in handcuffs.

26. HENRY had nothing illegal on his person.

27. Defendant CONNEELY did not find anything illegal on HENRY's person.

28. Because it was daylight and there were many people around, HENRY requested to be placed in the back of Defendant CONNEELY's vehicle.

29. Defendant CONNEELY refused and detained HENRY on the side of the road.

30. Defendant CONNEELY made HENRY sit on the curb of the busy road with his hands handcuffed behind his back.

31. HENRY was not free to leave during his entire interaction with Defendant CONNEELY.

32. Defendant CONNEELY searched HENRY's car.

33. HENRY did not have anything illegal in his car.

34. Defendant CONNEELY did not find anything illegal in HENRY's car.

35. After detaining him and searching him and his vehicle, Defendant CONNEELY released HENRY without any tickets or charges.

**The Chicago Police Department's Long History of Unconstitutional Stop and Frisks**

36. Defendant CITY has a long history of unlawful stop and frisks ("Terry stops"), including disproportionately high rates of stop and frisks of African Americans.

3

37. This history dates back as far as the 1980s when the Chicago police would conduct sweeps of supposed high-crime neighborhoods.

38. In the early 1980s, the Chicago Reporter found that more than 100,000 citizens were arrested for "disorderly conduct" during sweeps of high-crime neighborhoods. These arrests were usually preceded by a stop and frisk and the cases almost never resulted in convictions because the police generally did not show up in court to defend the arrest.

39. An American Civil Liberties Union ("ACLU") lawsuit successfully challenged this practice and, as a result, disorderly conduct arrests and their accompanying stop and frisks plummeted. *Michael Nelson v. City of Chicago*, 83 CV 1168 (N.D. Ill.)

40. In the 1990s, organized *Terry* stops reemerged under the "gang loitering ordinance." That ordinance – later struck down by the U.S. Supreme Court – resulted in more than 40,000 arrests over 18 months of enforcement. *City of Chicago v. Morales*, 527 U.S. 41 (1999). Massive numbers of people were arrested and searched, often without a legally justifiable reason, for refusing to follow dispersal orders under the "gang loitering ordinance." In reality, the ordinance was a method for stopping and searching young men of color.

41. In the early 2000s, unwarranted stops and searches were still commonplace. In 2003, the ACLU filed a lawsuit on behalf of Olympic Gold medalist Shani Davis and several others, challenging a series of humiliating stop and frisk searches by Chicago police. *Davis v. City of Chicago*, 03 CV 2094.

42. Data collected in connection with that suit showed a pattern of unjustified stops and searches, resulting in the unnecessary detention of young people of color. The City ultimately settled the *Davis* lawsuit, and as a result made changes to the police department's policy of stopping and searching on the streets, including a requirement to record why stops occur.

**CPD's own data reveals its unconstitutional traffic stop policies.**

43. On July 18, 2003, Senate Bill 30 was signed into law to establish a four-year statewide study of data from traffic stops to identify racial bias.

44. This study is referred to as the Illinois Traffic and Pedestrian Stop Study ("Traffic Stop Study").

45. The study began on January 1, 2004 and was originally scheduled to end December 31, 2007. However, the legislature has extended the data collection deadline several times and also expanded the study to include data on pedestrian stops.

46. According to data that CPD reports to the Illinois Department of Transportation (IDOT) for purposes of the Traffic Stop Study, CPD's total number of traffic stops increased from approximately 83,000 stops in 2014 to 535,088 total traffic stops in 2023.

47. In recent years, the vast majority of CPD traffic stops have not even resulted in the issuance of any citations.

48. In 2021, only 4.8% of CPD traffic stops resulted in any citation.

49. In 2022, only 3.4% of CPD traffic stops resulted in any citation.

50. In 2023, only 3.5% of CPD traffic stops resulted in any citation.

51. By contrast, in 2015, CPD officers wrote citations in over 65% of traffic stops.

52. According to CPD's own data, black drivers are stopped at a disproportionately higher rate considering how much of the driving and general population of Chicago they make up.

53. In 2019, Black drivers were 5.56 times more likely to be stopped than white drivers in Chicago.

54. In 2020, Black drivers were 7 times more likely to be stopped than white drivers in Chicago.

55. In 2021, Black drivers were 5.1 times more likely to be stopped than white drivers in Chicago.

56. In 2022, Black drivers were 3.84 times more likely to be stopped than white drivers in Chicago.

57. In 2023, Black drivers were 3.75 times more likely to be stopped than white drivers in Chicago.

58. The racial disparity occurs even in predominantly white Chicago neighborhoods. According to the IDOT's Traffic Stop Studies for 2021, 2022, and 2023, Black and Latino drivers were 1.25 to

4 times more likely than white drivers to be stopped in all of the predominantly white police districts in Chicago in each of those years.

59. CPD officers are also more likely to search Black drivers but are more likely to find contraband when searching white drivers.

60. According to CPD data for 2016 through 2022, 67.53% of vehicles that CPD officers searched during traffic stops were driven by Black individuals and just 4.75% of the searches conducted were of cars driven by white people.

61. CPD data also indicates that in 2022, CPD officers found contraband in 9% of their searches of white drivers' vehicles but found contraband in only 6.4% of their searches of Black drivers' vehicles.

62. For many years, after CPD started collecting this data pursuant to Illinois' traffic stop study, CPD ignored the unconstitutional patterns illuminated by the traffic stop study data and the City perpetuated CPD's unconstitutional stop and frisk policies by failing to track patterns and hold its officers accountable for unconstitutional *Terry* stops.

## The 2015 ACLU Report on CPD's Stop and Frisk Policies

63. In 2014, the ACLU conducted a review of Defendant CITY's data on its use of stop and frisk and published a report in March of 2015 ("2015 ACLU report").

64. In its report, the ACLU concluded that there are persistent problems with how Defendant CITY uses stop and frisks, including inadequate training, supervision, and monitoring of law enforcement in minority communities.

65. The 2015 ACLU Report noted that officers frequently stopped individuals for reasons unrelated to a suspicion of a crime and that both police officers and supervisors need additional training on when a stop is legally justified.

66. The 2015 ACLU report found that in half of CPD's stops (based on the sample analyzed), the officer did not record legally sufficient reasons to establish reasonable suspicion.

67. The 2015 ACLU report also found that a large percentage of Chicago police officers did not record the reasons for the stop, even though the department requires that officers do so.

68. The 2015 ACLU report also found that African Americans were disproportionately subjected to stops by the CPD when compared to their white counterparts.

69. According to the 2015 ACLU report, African American Chicagoans were subjected to 182,048 stop and frisks, meaning they were the targets of 72% of all stops despite constituting just 32% of the City's population.

70. Furthermore, the 2015 ACLU report noted there were more stops per capita in minority neighborhoods. For example, in the minority district Englewood there were 266 stops per 1,000 people, while in the predominantly white district Lincoln/Foster there were 43.

71. Also, according to the 2015 ACLU report, the differences in stop rates among racial groups also occurs outside minority communities. In Jefferson Park, a predominantly white district, African Americans made up almost 15% of all stops even though the African American population is just 1% there.

72. The 2015 ACLU report also found that there were more than 250,000 stops that did not lead to an arrest in Chicago for the time period of May 1, 2014 through August 31, 2014.

73. Comparing stops to populations, the ACLU report Chicagoans were stopped at a far higher rate than New Yorkers at the height of New York City's stop and frisk practice in 2011, which was found to violate the Fourth and Fourteenth Amendments of the United States Constitution in *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y, 2013).

74. The 2015 ACLU report found that from May to August 2014, there were 93.6 stops per 1,000 people in Chicago and by contrast, in 2011, at the height of New York City's illegal stop and frisk practice, there were 22.9 stops per 1,000 people.

75. As a result of the ACLU's investigation and report, Defendant CITY entered into a settlement agreement with the ACLU where Defendant CITY agreed to take steps to ensure that CPD policies and practices would be reformed to comply with the Fourth Amendment and the Illinois Civil Rights Act.

76. Former Magistrate Judge Arlander Keys oversees Defendant CITY's compliance with this settlement agreement and conducts independent evaluations of CPD's stop and frisk practices and procedures, data collection and training for officers.

**The Department of Justice (DOJ) findings that CPD engages in race-based policing.**

77. The United States Department of Justice ("DOJ") undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

78. The DOJ report found evidence of race-based policing including stop and frisks.

79. According to the DOJ report, "[o]ne *sergeant* told us that 'if you're Muslim, and 18 to 24, and wearing white, yeah, I'm going to stop you. It's not called profiling, it's called being proactive.'" (emphasis in original).

80. "CPD's own officers, especially, but not only, its black officers, acknowledge profiling and harassment by CPD. A lieutenant told us, 'I'm a black man in Chicago, of course I've had problems with the police.'"

81. "One black officer said that he had been stopped many times by police in the Englewood neighborhood for no reason other than he is a black man in a nice car."

82. In its 2017 report, the DOJ described "engrained deficiencies" in CPD training that undermine officers' ability to engage in constitutional policing. DOJ Report at 93.

83. The DOJ report also found that "[r]ather than ensuring that officers under their watch are policing constitutionally, many sergeants instead focus on keeping their subordinates out of trouble when there may be reason for discipline." *Id.*, at 105.

84. Following the DOJ's investigation, the City and the state of Illinois entered into a consent decree requiring the CPD and the City to reform policies and practices in a number of important areas, such as impartial policing, training, supervision, accountability, and more.

85. An Independent Monitoring Team ("IMT") was established to evaluate CPD's compliance with the Consent Decree.

86. A May 2024 report by the IMT assessing CPD's progress under the Consent Decree found that, after five years of operating under the Consent Decree, CPD has not reached full compliance with any of the Consent Decree's 97 requirements related to CPD's training and supervision of officers.

**CPD's illegal traffic stop practices are widely acknowledged but still they continue.**

87. On July 11, 2023 (just two months before Defendant CONNEELY's unlawful stop of HENRY), the Honorable Virginia M. Kendall of the Northern District of Illinois ruled that there was a reasonable basis to infer "that Chicago maintained a policy that disproportionately targeting motorists based on race," and denied the City's motion to dismiss allegations that the City employed a pattern and practice of racially discriminatory pretextual traffic stops. *King v. City of Chicago*, 2023 WL 4473017, at *6 (N.D. Ill., July 11, 2023).

88. In September 2023 (the month HENRY was unlawfully stopped by CONNEELY), Mayor Brandon Johnson admitted that "Chicago has a long history of disparities in Black and Brown communities, especially on the South and West sides…It is disheartening to see that even today, residents in Black communities are targeted for traffic stops four times more than others, with my neighborhood of Austin seeing some of the highest rates of profiling in the state."

9

89. Numerous recent opinions from the Illinois Appellate Court, First District, likewise have placed the City on notice of CPD's unlawful practice of targeting Black drivers for pretextual traffic stops. In *People v. Carpenter*, 2024 IL App (1st) 220970, ¶¶6-11, the Appellate Court criticized CPD for improperly targeting motorists for "driving while Black," calling the practice a "systemic injustice" that should be "dismantle[ed.]"

90. In *People v. Evans*, 2024 IL App (1st) 22- 0384-U, ¶71, a dissenting Justice noted the pretextual and discriminatory nature of a CPD traffic stop: "The actual purpose of the stop was to engage in a fishing expedition for unrelated criminal activity in a supposedly high-crime and high-narcotic area—a trope that . . . reeks of racial bias."

91. According to a February 21, 2024 investigative news report by ABC7, between 2016 and early 2024, the City settled at least twenty-four federal lawsuits, with payouts totaling nearly $920,000, after drivers filed allegations of improper and/or discriminatory traffic stops by CPD officers.

92. Yet, CPD rarely disciplines officers for misconduct.

94. Despite the City's knowledge of CPD's widespread practice of racially motivated and unconstitutional traffic stops, the City has failed and continues to fail to adequately screen, train, supervise, and discipline CPD officers to ensure that their traffic stops and associated frisks and searches are not unconstitutional.

95.  These long-standing systemic failures by the City of Chicago to properly investigate, train and supervise CPD officers regarding illegal stops and searches; the CITY's systemic failures to adequately monitor and discipline CPD officers for illegal stops and searches' have encouraged officer misconduct such as that committed by Defendant CONNEELY towards HENRY.

## COUNT I
(42 U.S.C. Section 1983 - Unlawful Search and Seizure)

96. Each of the forgoing paragraphs is incorporated as if fully restated here.

97. As described above, Defendant CONNEELY seized and searched HENRY and his car, without probable cause or any other legal justification to do so. This was a violation of the Fourth Amendment to the United States Constitution.

98. As a direct and proximate cause of his unlawful search and seizure, HENRY suffered a loss of liberty and other damages, which will be proven at trial.

   **WHEREFORE,** HENRY prays for a judgment against the Defendant CONNEELY in a fair and just amount to compensate them for his damages, plus punitive damages, as well as court costs, attorneys' fees, and any other relief the Court finds to be just and equitable.

### COUNT II
(42 U.S.C. Section 1983 - Equal Protection Claim)

99. Each of the preceding paragraphs is incorporated as if fully restated here.

100. In the manner described above, Defendant CONNEELY racially profiled and intentionally discriminated against HENRY on the basis of his race in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

101. As a result of Defendant CONNEELY's misconduct described in this Count, HENRY suffered damages, which will be proven at trial.

   **WHEREFORE**, HENRY prays for a judgment against Defendant CONNEELY in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorneys' fees, and such other relief as is just and equitable.

### COUNT III
(Policy Claim - Defendant CITY)

102. Each of the preceding paragraphs is incorporated as if fully restated here.

103. The misconduct of Defendant CONNEELY alleged above was undertaken pursuant to the policy and practice of Defendant CITY.

104. As a matter of both policy and practice, Defendant CITY has encouraged the type of police

misconduct at issue in this case by failing to adequately train, investigate, and/or discipline Chicago police officers, and these failures constitute deliberate indifference.

105. The following of Defendant CITY's policies and persistent widespread customs and practices were the driving force behind Defendant CONNEELY's misconduct:

   A. Failing to adequately train, monitor, supervise, and discipline Chicago police officers in the exercise of their discretion to stop, detain, and search civilians.

   B. Failing to conduct adequate auditing to determine if the stop and frisks conducted by CPD officers comply with the Fourth Amendment.

   C. Failing to take sufficient corrective and remedial action against CPD officers who provide fabricated, false, or impermissible justifications for stop and frisks.

   D. Encouraging, sanctioning, and failing to rectify CPD's custom and practice of suspicion less stop and frisks.

   E. Stopping, detaining, and searching civilians without a warrant, probable cause, reasonable suspicion, consent, or any other lawful basis.

106. These policies, practices or customs of Defendant CITY, individually and collectively, have been maintained and/or implemented with deliberate indifference by Defendant CITY, encouraging and allowing Defendant CONNEELY to commit the wrongful acts against HENRY, and therefore, acted as the direct and proximate cause of the injuries sustained by HENRY.

107. These policies, practices or customs of Defendant CITY, individually and/or collectively were the moving force behind Defendant CONNEELY's conduct, depriving HENRY of his rights under the United States Constitution.

   **WHEREFORE**, Plaintiff prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages, injunctive and declaratory relief, as well as such other relief as is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

VANCE HENRY, Plaintiff.

By: /s Torreya L. Hamilton
    One of Plaintiff's Attorneys

HAMILTON ⚖ HENNESSY, LLC
53 West Jackson Boulevard, Suite 620
Chicago, Illinois 60604
312.726.3173
tlh@hamilonhennessy.com
Attorney No. 6229397